IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JENNIFER PHOENIX,      :   CIVIL ACTION NO.
     :   1:14-CV-2689-AT-JSA
    Plaintiff,      :
     :
    v.      :
     :   **FINAL REPORT AND**
COBB COUNTY, GEORGIA,      :   **RECOMMENDATION ON A**
     :   **MOTION FOR SUMMARY**
    Defendant.      :   **JUDGMENT**

     Plaintiff Jennifer Phoenix, a former police officer with Defendant Cobb County, Georgia, suffered a shoulder injury and concussion when she slipped on duty. Once she returned to work, Defendant permitted her to remain in a light-duty position. However, after her treating physician opined that Plaintiff would never return to a full-duty officer position, Defendant demoted Plaintiff to a public services technician position. Plaintiff alleges in this employment discrimination lawsuit that Defendant failed to provide her with a reasonable accommodation for her disability, in violation of the Americans with Disabilities Act of 1990, as amended ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, and discriminated against her on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000, *et seq.* Plaintiff further alleges that Defendant retaliated against her, in violation of Title VII and the ADAAA, for filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). This matter is now before

the Court on Defendant's Motion for Summary Judgment [42]. For the reasons stated below, the undersigned **RECOMMENDS** that Defendant's Motion [42] be **GRANTED IN PART and DENIED IN PART**.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Material Facts ("SOMF") [42-2]; Plaintiff's Response thereto ("Pl. Res. Def. SOMF") [47]; Plaintiff's Statement of Material Facts ("Pl. SOMF") [46-4]; and Defendant's Response thereto ("Def. Res. Pl. SOMF") [53]. The Court has excluded assertions of "fact" by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). In addition, all facts supported by citations to evidence are deemed to be admitted, unless they are disputed by the opposing party with "concise responses supported by specific citations to evidence," or otherwise disputed on the basis of a valid objection. LR 56.1B(2)(a)(2), NDGa. The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion

for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Defendant has objected to most of Plaintiff's additional facts with a blanket objection: "Defendant objects on the grounds that Respondent's fact is not material or does not otherwise comply with the provisions set out in LR 56.1B(1)." (*See, e.g.,* Def. Res. Pl. SOMF ¶¶ 2-13). The Court has considered Defendant's objections and has included those facts that the Court has nevertheless deemed to be material and compliant with the Local Rules. Defendant has additionally argued that some of Plaintiff's proffered facts are not supported by the citation she provides. (*See, e.g.*, Def. Res. Pl. SOMF ¶¶ 3, 13, 16, 18, 24, 29, 32, 41-42). The Court has considered Defendant's arguments but has included those facts that it deems are properly supported by the cited evidence.

As the Court noted in an Order dated April 19, 2016 [54], Plaintiff failed to file the majority of the deposition and documentary support that she cited in her Statement of Material Facts and Response to Defendant's Statement of Material Facts. This failure was in violation of Local Rule 56.1C, NDGa ("The parties must file as exhibits to their briefs the originals of any affidavits relied upon in their motion and response papers, and copies of those excerpts of depositions or other

discovery materials that are referenced therein."). The Court noted that it could in its discretion disregard all assertions of fact supported by a citation to evidence not submitted to the Court in violation of this rule. Nevertheless, the Court is not eager to decide the merits of cases on procedural grounds, and accepts counsel's explanation for the filing failure and the lack of any evident prejudice to Defendant. Thus, the Court has permitted Plaintiff to file this material out-of-time, which she has done, and the Court has considered it in connection with this motion.[1]

Accordingly, the Court finds as follows: Defendant Cobb County, Georgia employs nearly 5,000 full and part-time employees, including those who work in law enforcement. (Def. SOMF ¶ 1; Pl. Res. Def. SOMF ¶ 1). The Cobb County Police Department, which contains over 600 sworn officers and 150 civilian employees, is a branch of the Cobb County Department of Public Safety ("DPS"). (Def. SOMF ¶¶ 12, 14; Pl. Res. Def. SOMF ¶¶ 12, 14).

To serve as a police officer in the state of Georgia, a person must obtain certification from the Georgia Peace Officer Standards and Training Council ("POST"), which establishes the minimum training standards and curriculum for the

---

[1] The Court, however, ordered Plaintiff's counsel to show cause why a modest monetary sanction should not be imposed in light of the violation of the Local Rules. Plaintiff has submitted a response. The Court concludes that a sanction is not warranted at this time and simply admonishes counsel to comply with Local Rule 56.1 with regard to future cases.

people it certifies. (Def. SOMF ¶ 15; Pl. Res. Def. SOMF ¶ 15). The Police Officer

II class specification states:

> While performing duties of a Police Officer, tasks involve the intermittent performance of extremely physically demanding work, typically involving some combination of reaching, bending, stooping, kneeling, crouching, running, climbing, and that may involve the lifting, carrying, pushing, and/or pulling of extremely heavy objects (200+ pounds), such as in the event of chasing and subduing a suspect resisting arrest.

(Def. SOMF ¶ 16; Pl. Res. Def. SOMF ¶ 16).[2] Officers are required to bench press

half their body weight during physical training sessions. (Pl. SOMF ¶ 182). A police

officer may be assigned to a specific functional area, such as field training, special

investigations, narcotics, or a specialty unit. (Def. SOMF ¶ 17; Pl. Res. Def. SOMF

¶ 17). The Cobb County Police Department does not have permanent, restricted-duty

positions for police officers.[3] (Def. SOMF ¶ 18). All police officers, regardless of job

assignment, other than those on temporary duty, must be able to perform the essential

functions of the police officer position, with or without reasonable accommodation.

---

[2] Plaintiff admits that the specification states these requirements but objects to the implementation of this specification. (Pl. Res. Def. SOMF ¶ 13). She contends that no one was tested to verify the ability to carry, push, or pull 200 pounds. (*Id.*). Additionally, she argues that police officers are not required to lift a certain weight. (*Id.*). Instead, they must be able to bench press half of their body weight. (*Id.*).

[3] Plaintiff acknowledges Defendant's assertion that it does not have a permanent police desk officer position, but she argues that Defendant permits male officers to remain on desk duty for indefinite periods. (Pl. Res. Def. SOMF ¶ 18).

(*Id.*). Having police officers who are unable to meet the physical requirements of the position would endanger the safety of the employee's fellow officers and the public. (Def. SOMF ¶¶ 19, 75; Pl. Res. Def. SOMF ¶¶ 19, 75).

Although certain posts, such as Police Headquarters desk officer assignments and training duty assignments in the Safety Village, are primarily administrative in nature, unless an officer is at such a post as part of a temporary, restricted-duty period, each of these officers has been released to full duty by his or her respective physician and could, if asked, perform all the duties of a police officer. (Def. SOMF ¶ 73). Some officers have been in their current desk assignments for a few years, but there is no guarantee that these officers will not be transferred to other assignments based on need. (*Id.* ¶ 74). Even if assigned to desk duties, should an emergency arise, officers performing administrative assignments would have to render assistance and be able to perform all the essential functions of the police officer position, including lifting.[4] (*Id.* ¶ 76). Other than officers serving in temporary, restricted-duty assignments, all sworn police officers have been released to full duty, and when other male and female police officers were unable to perform the physical duties of the

---

[4] Plaintiff alleges that Michael Crider was on light, administrative desk duty as a police officer for more than 21 months, and that Officer Ely was in a light, desk duty police officer position for about one year. (Pl. Res. Def. SOMF ¶ 73; Pl. SOMF ¶¶ 244-47).

position following a workers' compensation injury, they were transferred out of their sworn police officer positions. (*Id.* ¶ 77).

Plaintiff began working with the Cobb County Police Department in July 2009 and became a Police Officer II in 2010. (Def. SOMF ¶ 20; Pl. Res. Def. SOMF ¶ 20). During her approximately four years as an employee, Plaintiff received at least two letters of reprimand and three suspensions. (Def. SOMF ¶ 21; Pl. Res. Def. SOMF ¶ 21). Although Plaintiff could have appealed her suspensions to the Cobb County Civil Service Board, she chose not to do so. (Def. SOMF ¶ 22; Pl. Res. Def. SOMF ¶ 22). On July 23, 2011, Plaintiff was injured while on duty. (Def. SOMF ¶ 23; Pl. Res. Def. SOMF ¶ 23). Specifically, Plaintiff slipped on a step, grabbed a banister with her left hand, hurt her left shoulder, and suffered a head injury. (Pl. SOMF ¶ 55). That night, Plaintiff contacted A.J. Leo, the sergeant on duty, to tell him that she was injured. (*Id.* ¶ 56).

Plaintiff was placed on no-duty status on July 23, 2011, and she returned to work in a light-duty capacity on August 25, 2011. (Def. SOMF ¶ 23; Pl. Res. Def. SOMF ¶ 23; Pl. SOMF ¶ 58). However, after two days, Plaintiff's neurologist removed her from work. (Def. SOMF ¶ 29; Pl. Res. Def. SOMF ¶ 29). Plaintiff only returned to work again–in a restricted-duty capacity–in December 2011. (*Id.*).

7

In August 2011, as Plaintiff had exhausted her leave, she requested leave donations under Defendant's leave donation program, which was part of its annual leave policy. (Def. SOMF ¶¶ 10, 27; Pl. Res. Def. SOMF ¶¶ 10, 27). Defendant's leave donation policy states:

> An employee ("donor") may donate accrued, unused annual leave to an employee ("recipient") who has exhausted all available leave balances (annual, sick, compensatory) and who would otherwise need to take leave without pay due to personal catastrophic health conditions/injuries or similar health conditions/injuries affecting qualified family members.
>
> 1. An illness or injury is considered catastrophic if it poses a threat to life and/or requires inpatient, hospice, or resident health care. Examples of catastrophic health conditions include heart attacks, cancer, and serious motor vehicle accidents.
>
> **Minor illnesses or injuries or chronic medical conditions that are not catastrophic do not qualify for the annual leave donation program.**

(Def. SOMF ¶ 10; Pl. Res. Def. SOMF ¶ 10). After reviewing Plaintiff's documentation, the human resources department determined that Plaintiff was ineligible because she had not suffered a catastrophic incident following her return to work. (*Id.*).

Defendant also maintains a workers' compensation program that complies with the Georgia Workers' Compensation Act for employees who are injured on the job. *Id.* Defendant's workers' compensation policy was last revised in August 2012 and

now more closely tracks Georgia law regarding workers' compensation and includes practices, such as restricted duty, that certain departments follow. (Def. SOMF ¶ 4; Pl. Res. Def. SOMF ¶ 4). Defendant did not have a county-wide, light-duty policy before 2012, so each department within Cobb County could make its own decisions regarding light duty. (Pl. SOMF ¶¶ 11-12). However, the revised policy, which is not retroactive, now authorizes Defendant to work with departments to place people in modified or restricted-duty positions. (*Id.* ¶¶ 5, 10, 13).

The restricted-duty policy of the DPS that was in effect when Plaintiff suffered a workers' compensation injury stated:

> Employees who are not fit for duty as a result of a Worker's Compensation injury are eligible for 'restricted duty' assignments for an initial six (6) months. However, the Cobb County Department of Public Safety will attempt where required or appropriate, to place such employees who remain not fit for duty after the expiration of six (6) months in a 'restricted duty' assignment for up to an additional six (6) months. The Public Safety Director will consider each extension request on a case by case basis.

(*Id.* ¶¶ 14-15). Accordingly, the DPS decided whether to accommodate an injured police officer for more than six months. (*Id.* ¶ 17). The fitness-for-duty policy of the DPS contained the same language as the restricted-duty policy. (*Id.* ¶ 18). The responsibility to find a restricted-duty position for an employee with a workers' compensation injury falls to the immediate supervisors, up through the chain of

command to the deputy chief. (*Id.* ¶ 20). Chief Houser appointed Charles Cox to the Deputy Chief position in May 2013. (*Id.* ¶ 21; Cox Dep. [58] at 6).

After Plaintiff's injury, Defendant did not initially file a first report of injury, but later did so–on August 19, 2011–after Plaintiff contacted the human resources department on August 16, 2011 and after reviewing the circumstances of the incident. (Def. SOMF ¶¶ 24-25; Pl. Res. Def. SOMF ¶¶ 24-25; Pl. SOMF ¶ 62). Although Plaintiff complained of issues relating to her head, the report only contained information about her shoulder injury because Defendant believed the head issues were related to a stroke. (Def. SOMF ¶ 26; Pl. Res. Def. SOMF ¶ 26; Pl. SOMF ¶ 68). As a result, Barbara White–Defendant's primary contact at AmTrust, its third party administrator for workers' compensation claims–controverted the claim regarding any injury to Plaintiff's head. (Def. SOMF ¶¶ 5-6, 26; Pl. Res. Def. SOMF ¶¶ 5-6, 26; Pl. SOMF ¶ 75). When a claim is controverted, Ms. White does not handle it and does not pay the bill for that claim. (Pl. SOMF ¶ 75).

Plaintiff returned to work in a restricted-duty capacity on December 28, 2011, after having shoulder surgery on December 9, 2011. (Def. SOMF ¶ 29; Pl. Res. Def. SOMF ¶ 29; Pl. SOMF ¶ 87). During the restricted-duty period, Plaintiff remained a police officer and did not have to perform the physical requirements of the police

officer position.[5] (Def. SOMF ¶ 30; Pl. Res. Def. SOMF ¶ 30). Ultimately, Plaintiff received six months of restricted duty. (Def. SOMF ¶ 31; Pl. Res. Def. SOMF ¶ 31).

In June 2012, Plaintiff requested an extension of her restricted-duty assignment.[6] (Def. SOMF ¶ 32; Pl. Res. Def. SOMF ¶ 32). During that month, Dr. Craig E. Weil, Plaintiff's authorized treating physician, prescribed a functional capacity evaluation ("FCE"), which is a comprehensive assessment of an individual's work-related abilities. (Def. SOMF ¶¶ 5, 33-34; Pl. Res. Def. SOMF ¶¶ 5, 33-34; Pl. SOMF ¶ 119). Defendant exclusively submitted the job description for the Police Officer II position, so the therapist could only evaluate Plaintiff's abilities regarding this specific position during the FCE. (Pl. SOMF ¶ 228). Defendant did not send any job descriptions for light-duty officer positions for the therapist to consider. (*Id.*). During the FCE, Plaintiff stated that she would be "unable to perform her job" as she was concerned about left shoulder pain, and did not want to injure her shoulder further. (Def. SOMF ¶ 35; Pl. Res. Def. SOMF ¶ 35). Plaintiff stated that her

_____

[5] Offering only her affidavit as support, Plaintiff alleges that she performed a variety of police officer duties. (Pl. Res. Def. SOMF ¶ 30).

[6] Plaintiff contends that, in September 2011, she began asking Defendant for restricted-duty positions. (Pl. SOMF ¶ 100). However, she only cites as support an unauthenticated e-mail that she sent to Shana Adams. (*Id.*).

vocational goal at the time was to transfer to a detective or investigative unit, even though Defendant had no open positions. (*Id.*).

On June 12, 2012, Dr. Weil noted that Plaintiff would "be on light duty at the most for an additional 6 weeks." (Pl. SOMF ¶ 120). However, Plaintiff's FCE from June 2012 stated "there is not a job match between the critical physical demands of her job (as outlined in the formal job description [for the Police Officer II position]), and the physical capacities she demonstrated during this evaluation." (Def. SOMF ¶ 36; Pl. Res. Def. SOMF ¶ 36). The FCE noted that Plaintiff was functioning at a "light physical demand level." (Pl. SOMF ¶ 226). On June 26 or 27, 2012, Dr. Weil released Plaintiff for "limited desk duty or office duty," and stated "even if the patient had additional surgery it is medically unlikely that she would ever return to the normal job as a police officer." (Def. SOMF ¶ 37; Pl. Res. Def. SOMF ¶ 37; Pl. SOMF ¶ 130).

After considering Dr. Weil's recommendation, Defendant determined that maintaining Plaintiff on restricted duty was inappropriate and decided to find Plaintiff a permanent position that was compatible with her medical restrictions. (Def. SOMF ¶ 38; Pl. Res. Def. SOMF ¶ 38). Defendant granted Plaintiff a two-week extension of her restricted-duty request while it attempted to identify an appropriate permanent position for her. (*Id.*).

In early July 2012, Defendant, with Dr. Weil's approval, determined that the appropriate position for Plaintiff was as a Public Services Technician II in the Cobb County Police Department's Records Division. (Def. SOMF ¶¶ 39-40; Pl. Res. Def. SOMF ¶¶ 39-40; Pl. SOMF ¶¶ 133-34, 154). No heavy lifting was involved with this position. (Pl. SOMF ¶ 205). Later that month, Defendant offered this position to Plaintiff. (Def. SOMF ¶ 40; Pl. Res. Def. SOMF ¶ 40). Defendant informed Plaintiff that this was the only suitable position it had for her, but that she could apply for other positions that satisfied her restrictions. (Def. SOMF ¶ 41; Pl. Res. Def. SOMF ¶ 41). Per the record, the only other person who has transitioned from a sworn officer position to a civilian position is Rachel Britton, a female employee. (Pl. SOMF ¶ 218). Defendant advised Plaintiff that, if she was later released to full-duty work and could perform the job duties of a police officer, she could reapply for a police officer position. (*Id.*).

Defendant offered and Plaintiff accepted an offer of suitable light-duty employment. (Def. SOMF ¶ 42; Pl. Res. Def. SOMF ¶ 42). Although the transfer from a police officer to a public services technician was a demotion with a reduction in pay from $20.92 per hour to $18.53 per hour, the Workers' Compensation statute provided benefits to make up for two-thirds of the difference. (*Id.*; Pl. SOMF ¶¶ 136-37). Plaintiff reported to work as a public services technician on July 23 or 24,

2012. (Def. SOMF ¶ 43; Pl. Res. Def. SOMF ¶ 43). From July 2012 until October or November 2012, Plaintiff had to sit in a small room and was not permitted to leave except for breaks and lunch. (Pl. SOMF ¶ 293). She filed a complaint against her supervisor Chris Bell for requiring her to sit in a small room in a chair for eight hours, consistently denying her unpaid leave requests, and other reasons; however, Defendant's investigation deemed this complaint "unfounded." (*Id.* ¶¶ 294, 297).

On October 10, 2012, in response to her request and in conformance with the Workers' Compensation statute, Plaintiff received a second opinion examination from Dr. Duralde who agreed with Dr. Weil's prior assessment. (Def. SOMF ¶ 44; Pl. Res. Def. SOMF ¶ 44; Pl. SOMF ¶¶ 176-77). Specifically, Dr. Duralde noted: "[I]f the patient cannot lift in the heavy range, I do not feel it is safe for her to return to that type of work and feel that she is best limited to a light-medium level of work according [to] the US Department of Labor." (*Id.*). Dr. Duralde further noted that repeating the FCE was "not unreasonable," but that it was expensive, and Defendant did not schedule another FCE for Plaintiff. (Def. SOMF ¶¶ 45-46; Pl. Res. Def. SOMF ¶¶ 45-46; Pl. SOMF ¶ 178).

On November 1, 2012, Dr. Weil released Plaintiff to full duty. (Pl. SOMF ¶ 184). On November 3, 2012, Ms. White spoke with Paula in Dr. Weil's office for clarification regarding Dr. Weil's release. (Def. SOMF ¶¶ 48-49; Pl. Res. Def. SOMF

¶ 48-49; Pl. SOMF ¶ 190). On November 6, 2012, Dr. Weil clarified his evaluation of Plaintiff's condition as follows: "For clarification on the full duty release. The patient is released to full duty at her current position not that of a police officer." (Def. SOMF ¶ 52; Pl. Res. Def. SOMF ¶ 52; Pl. SOMF ¶ 200).

Plaintiff filed a charge of discrimination ("Charge") alleging discrimination on the bases of gender and disability with the EEOC on November 9, 2012. (Def. SOMF ¶ 70; Pl. Res. Def. SOMF ¶ 70; Pl. SOMF ¶ 211). At no point did Plaintiff amend her EEOC Charge to include a retaliation claim. (Def. SOMF ¶ 72; Pl. Res. Def. SOMF ¶ 72). Defendant alleges that it took no disciplinary actions against Plaintiff after she filed her Charge. (Def. SOMF ¶ 21). However, Plaintiff alleges that the criminal investigation that Lieutenant Scherer initiated because Plaintiff allegedly impersonated a police officer on July 5, 2013 constitutes a disciplinary action. (Pl. Res. Def. SOMF ¶ 21).

Plaintiff and Defendant settled Plaintiff's July 2011 workers' compensation claim during an August 5, 2013 mediation. (Def. SOMF ¶ 53; Pl. Res. Def. SOMF ¶ 53). The settlement agreement included a general release and waiver of all claims "EXCEPT any and all Claims under the Americans with Disabilities Act and/or Title VII of the Civil Rights Act of 1964 arising from or related to Claimant's employment

15

with the County." (Pl. SOMF ¶ 356; Pl. Dep. [56], Exh. 17 at 1) (emphasis in original).

In July 2013, the Cobb County Police Department received an unsolicited complaint from a citizen, corroborated by another witness, that Plaintiff was claiming to be a police officer despite no longer being a police officer. (Def. SOMF ¶ 58; Pl. Res. Def. SOMF ¶ 58; Pl. SOMF ¶ 318). An Internal Affairs investigation began, and Plaintiff acknowledged that, in March 2013, her supervisor told her not to identify herself in writing or orally as a police officer, unless she was employed as a police officer. (Def. SOMF ¶ 59; Pl. Res. Def. SOMF ¶ 59). As the complaint raised criminal concerns, a criminal investigation began in Cobb County but was later turned over to the Marietta Police Department because the alleged criminal conduct took place in the city of Marietta. (Def. SOMF ¶ 60; Pl. Res. Def. SOMF ¶ 60). On August 5, 2013, after Plaintiff refused to participate in an interview, Marietta Detective D. Ohmann obtained an arrest warrant for Plaintiff for impersonating an officer, in violation of O.C.G.A. § 16-10-23. (Def. SOMF ¶ 67; Pl. Res. Def. SOMF ¶ 67; Pl. SOMF ¶ 328). Plaintiff turned herself in on August 9, 2013. (Pl. SOMF ¶ 336). Plaintiff voluntarily surrendered her POST certification, effective April 28, 2014, as part of the plea agreement that resulted in Plaintiff's criminal charge being nolle prossed. (Def. SOMF ¶ 68; Pl. Res. Def. SOMF ¶ 68; Pl. SOMF ¶ 337). Without

16

her POST certification, Plaintiff was not qualified to serve as a police officer in the state of Georgia. (Def. SOMF ¶ 69; Pl. Res. Def. SOMF ¶ 69).

On August 19, 2013, the Internal Affairs investigation found that Plaintiff had violated three policy provisions: (1) Cobb County DPS Code of Conduct 1.02 (Unbecoming Conduct); (2) Cobb County DPS Code of Conduct 1.04 (Conformance to Laws); and (3) DPS Code of Conduct 1.21 (Abuse of Position). (Def. SOMF ¶ 61; Pl. Res. Def. SOMF ¶ 61). Deputy Chief Cox drafted a letter to propose Plaintiff's termination and issued it to Plaintiff on August 22, 2013. (Def. SOMF ¶ 62; Pl. Res. Def. SOMF ¶ 62). When making the decision to terminate Plaintiff's employment, Deputy Chief Cox considered Plaintiff's extensive disciplinary history, policy violations, and the impact of Plaintiff's actions on the Department and the County. (Def. SOMF ¶ 63; Pl. Res. Def. SOMF ¶ 63). When Deputy Chief Cox gave Plaintiff the letter proposing her termination, she informed him that she had signed a letter of resignation as part of her workers' compensation mediation on August 5, 2013, and that the resignation would be effective on August 29, 2013. (Def. SOMF ¶ 64; Pl. Res. Def. SOMF ¶ 64). At this time, Deputy Chief Cox was not aware that Plaintiff had filed an EEOC Charge. (Def. SOMF ¶ 66; Pl. Res. Def. SOMF ¶ 66). Plaintiff remained in her position as a public services technician from July 2012 until her voluntary resignation on August 29, 2013. (Def. SOMF ¶ 71; Pl. Res. Def. SOMF

¶ 71). During this period of time, Plaintiff's pay and benefits remained the same, including her workers' compensation supplement, except for when Deputy Chief Cox placed Plaintiff on administrative leave without pay from August 22, 2013 until her disciplinary hearing on August 27, 2013. (Def. SOMF ¶ 71; Pl. Res. Def. SOMF ¶ 71).

Plaintiff has provided information regarding certain alleged comparators, who according to Plaintiff are male police officers with work restrictions who Defendant permitted to remain in restrictive duty positions indefinitely or at least significantly longer than Plaintiff was permitted to remain in such a position. Plaintiff's assertions, however, are in many cases not supported by the evidence she cites, as explained in detail below.

Plaintiff, for example, points to evidence that a male officer named Abner Duteau has been on desk duty since before May 2013 through at least October 2015. (*See* Pl. Resp. Def. SOMF ¶ 18) (citing Cox Dep. [58] at 98-99). Plaintiff also asserts, however, that "Abner Duteau has not been released to return to the road as a police officer . . . ." *Id.* The assertion of fact as to Duteau's ongoing work restriction is not supported by the deposition testimony that Plaintiff cites. To the contrary, when asked "[s]o any day you could go in and ask [Duteau] to hit the streets," Deputy Chief Cox responded, "Yes, ma'am." (Cox Dep. [58] at 98). In other words, there is no

evidence to show that Duteau, like Plaintiff, was unable if necessary to perform the full range of listed police officer duties.

As to Officer Jack Fulenwider, Plaintiff establishes through the testimony of Defendant's representative that as of the time of the deposition he was serving in a nonpermanent but indefinite desk position at police headquarters. (*See* Pl. Resp. Def. SOMF ¶ 18) (citing Cox Dep. [58] at 147:11-21). Plaintiff, however, introduces no admissible information as to the nature of Fulenwider's injuries or restrictions, if any. In other words, just as with Duteau, Plaintiff does not establish that Fulenwider is or has been restricted for any particular period of time. Plaintiff appears to cite her own deposition testimony in support of such facts. (*See* Pl. Resp. Def. SOMF ¶ 18) (citing Phoenix Dep. at 224-25). But she establishes no proper non-hearsay foundation for being able to testify about the medical and work restriction status of other employees.

Similarly, Plaintiff establishes that officer Carl Ely suffered arm injuries and was released to light-duty work in November 2013. (*See* Pl. Resp. Def. SOMF ¶ 18) (citing White Dep. [59] at 237, Exh. 57). Plaintiff cites to evidence that Ely was still designated as "full time/light duty" as of December 2013. (*See id.*) (citing White Dep. [59] at 236). Ely was still in a desk officer position as of October 2015, but Plaintiff points to no evidence that he was still under medical restrictions at that time. (*See id.*) (citing Cox Dep. [58] at 147).

Plaintiff also points to Michael Crider, who suffered an injury in 2010. (*Id.*). It is undisputed that Mr. Crider was never able to return to full-duty police work and, like Plaintiff, Defendant eventually sought to transfer Mr. Crider to permanent, civilian, light-duty jobs at lower pay than an officer job. (*See* Pl. Res. Def. SOMF ¶¶ 221-22; Def. Reply Br. [52] at 15 n.3). Plaintiff nevertheless asserts that "Crider's Worker's Comp situation and light duty status lasted for years; and he was still employed as a police officer until Summer of 2015." (Pl. Res. Def. SOMF ¶ 239) (citing White Dep. [59] at 224, 241).

The *admissible* facts in the record as to Crider's situation are more murky, however. It appears that Defendant permitted Crider to remain on light duty for at least two years. (*See* Pl. SOMF ¶ 221) (citing White Dep. [59], Exh. 59). The admissible evidence in the record to which Plaintiff cites, however, does not clarify the particular position that Crider held, and specifically whether it was as a police officer.[7] Plaintiff cites to White's deposition, but the cited testimony does not establish that Crider was still employed as a police officer in 2015. (*See* White Dep.

---

[7] Plaintiff cites correspondence stating that the County was permitting Crider to remain on light duty for an additional 24 months beyond the initial 6-month period. (*See* White Dep. [59], Exh. 59). However, the evidence Plaintiff cites does not state that Crider was being allowed to remain specifically as a Police Officer on restricted-duty status. Rather, the correspondence states that "[t]he county is looking for other work for him at this time which would be a permanent light duty job with reduced pay and TBD benefits." (*Id.*)

[59] at 224, 241). Plaintiff separately cites a report prepared by a functional capacity evaluator, dated June 5, 2015, which reflects statements made by Crider as to his work history, including that he was employed by Defendant in a modified desk officer position from January 2012 until March 31, 2015. (*See* Pl. SOMF ¶ 232) (citing White Dep. [59], Exh. 61). Crider's statements as recounted in the evaluator's report would appear to be inadmissible hearsay, however, and Plaintiff provides no explanation or other foundation.[8]

Defendant, for its part, argues in its brief that Crider, like Plaintiff, was transferred to a permanent, light-duty job when it became evident that he would never be able to return to full duty as a police officer. *See* Def. Reply Br. [52] at n.3. Plaintiff does not identify any evidence showing that Crider was allowed to remain on restricted-duty status as a police officer after a medical diagnosis stating that he would likely never return to full-duty status.

Plaintiff also asserts that male police officers R.C. Cole and T.R. Alexander suffered certain injuries or illnesses and were permitted to remain in a light duty

---

[8] These were not statements made to a treating provider for purposes of diagnosis or treatment but rather to an occupational evaluator. Moreover, the statements were not about medical history, symptoms, or causes of medical conditions, but rather were about Crider's employment history. Therefore, these statements would not appear to be admissible under the hearsay exception for statements made for purposes of diagnosis or treatment, *see* FED. R. EVID. 803(4).

police officer capacity for an unstated periods of time. (*See* Pl. Resp. Def. SOMF ¶ 18). Plaintiff cites nothing other than her own testimony in support of any of these facts, however, without any indication of what non-hearsay basis Plaintiff has to testify about medical conditions, work restrictions, and duty accommodations provided to these other employees. The same problem exists as to Plaintiff's assertion of facts relating to the medical and work status of Larry White, David Lee Moss, Jeremy Lorens, John Largent, David Snow, Rachel Britton, Jeff Daniel, Geoffrey Edgecomb, Jessica Bearden McManus, Quinn Harris, Brandon Moore, Duane Morris, Mr. Feinauer, and Sean Henry. (*See* Pl. SOMF ¶¶ 257, 259-275). The Court therefore disregards these asserted facts as inadequately supported by admissible evidence.

On May 21, 2014, the EEOC issued Plaintiff a Notice of Right to Sue based on her November 9, 2012 Charge. Complaint [1] ¶ 2. On August 19, 2014, Plaintiff filed her Complaint [1] in the instant lawsuit, alleging that Defendant discriminated and retaliated against her based on her gender, in violation of Title VII, and her disability, in violation of the ADAAA.

## II.   DISCUSSION

### A.   Workers' Compensation Claim

Defendant argues that the Georgia Workers' Compensation Act's exclusivity doctrine bars Plaintiff's Title VII and ADA claims. Def. Br. [42-1] at 19. Specifically,

Defendant contends that because Plaintiff settled her workers' compensation claim, she is estopped from pursuing the instant lawsuit. *Id.* at 22.

Plaintiff responds that the August 2013 settlement agreement that resolved her workers' compensation claims contained an express provision that exempted Plaintiff's claims under Title VII and the ADAAA. Pl. Res. [46] at 4. She argues that the instant lawsuit focuses on civil rights violations and not her personal injuries, and thus the Workers' Compensation Act does not preclude her from recovering damages for her discrimination claims. *Id.* at 5.

Plaintiff is correct. The exclusivity doctrine of the Georgia Workers' Compensation Act states in relevant part:

> The rights and the remedies granted to an employee by this chapter shall exclude and be in place of all other rights and remedies of such employee . . . and all other civil liabilities whatsoever at common law or otherwise, on account of such injury, loss of service, or death; provided, however, that the employer may be liable to the employee for rights and remedies *beyond those provided in this chapter by expressly agreeing in writing to specific additional rights and remedies*; provided, further, however, that the use of contractual provisions generally relating to workplace safety, generally relating to compliance with laws or regulations, or generally relating to liability insurance requirements shall not be construed to create rights and remedies beyond those provided in this chapter.

O.C.G.A. 34-9-11 (emphasis added). Here, the parties' settlement agreement included a general release and waiver of all claims "EXCEPT any and all Claims under the

Americans with Disabilities Act and/or Title VII of the Civil Rights Act of 1964 arising from or related to Claimant's employment with the County." (Pl. SOMF ¶ 356; Pl. Dep. [56], Exh. 17 at 1) (emphasis in original). The settlement agreement expressly noted that it did not bar Plaintiff's Title VII and ADAAA claims, and Georgia law allows for such a provision. *See* O.C.G.A. § 34-9-11. Accordingly, these claims may proceed. *See Bledsoe v. Palm Beach Cnty.*, 133 F.3d 816, 819-20 (11th Cir. 1998) (a release specific to a workers' compensation claim did not implicitly release federal discrimination claims).

###### B.   Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court

24

must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See Matsushita*, 475 U.S. at 587. The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *See id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See Anderson*, 477 U.S. at 248. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

### C.   ADA Claim

Plaintiff alleges that she is an individual with a disability who was, with or without reasonable accommodation, capable of performing the essential functions of the police officer job. Complaint [1] ¶ 62. Before she was cleared to return to full

duty, Defendant denied Plaintiff a reasonable accommodation as a police officer on light desk duty, even though such positions were available. *Id.* ¶¶ 46, 62. Thus, Plaintiff argues that Defendant denied her a reasonable accommodation and discriminated against her based on her disability. *Id.* ¶¶ 62, 64.

The ADA was "designed to prohibit discrimination against disabled persons and enable those persons 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled.'" *Paleologos v. Rehab Consultants, Inc.*, 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (quoting *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995)). The statute forbids employers from discriminating against a "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). Refusing to offer a reasonable accommodation to allow a disabled worker to perform the essential tasks of the job is a form of illegal discrimination under the ADA. *See* 42 U.S.C. § 12112(b)(5).

To prevail on a claim of disability discrimination, Plaintiff must show that (1) that she has a disability within the meaning of the statute and relevant regulations;

(2) that she is an otherwise qualified individual, that is, that she could perform the essential tasks of her job with a reasonable accommodation; and (3) Defendant discriminated against her based on her disability. *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003). Similarly, to prevail on a failure-to-accommodate claim, Plaintiff must demonstrate that: (1) she is disabled; (2) she was a "qualified individual" when she suffered the adverse employment action; and (3) that she was discriminated against because of her disability by being denied a reasonable accommodation to allow her to keep working. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Hilburn*, 181 F.3d at 1226; *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997); *Harris v. H & W Contracting Co.*, 102 F.3d 516, 519 (11th Cir. 1996); *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996).

### 1. *Disability*

Plaintiff must first demonstrate that she has a disability as it is defined under the ADA. Under the ADA, an individual with a "disability" is any person who: (1) has a physical or mental impairment that substantially limits one or more of such person's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1); *see also Harris*, 102 F.3d at 519; *Gordon v. E.L. Hamm & Assocs.*,

*Inc.*, 100 F.3d 907, 911 (11th Cir. 1996); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996). The regulations further define physical or mental impairment as including: (1) any physiological disorder or condition affecting one or more of several body systems; or (2) any mental or psychological disorder. *See* 29 C.F.R. § 1630.2(h); *see also Gordon*, 100 F.3d at 911.

Major life activities are defined as those basic activities that the average person in the general population can perform with little or no difficulty. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(i); *McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1496 (N.D. Ga. 1996). They include activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *See* 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(I); *see also Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000); *McCollough*, 929 F. Supp at 1496; *Frix v. Fla. Tile Indus., Inc.*, 970 F. Supp. 1027, 1033 (N.D. Ga. 1997). Major life activities may also include sitting, standing, lifting, and reaching. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(I); *Frix*, 970 F. Supp at 1033.

The ADA was amended in 2008 pursuant to the ADA Amendments Act [ADAAA], Pub L. No. 110-325, to broaden the definition of disability. 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor

of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard.").

Plaintiff's lifting restrictions, 15 pounds on a frequent basis and 35 pounds occasionally, *see* [56-2] at 4, alone qualify under this broad definition of disability. Indeed, the ADAAA regulations specifically include lifting as a major life activity for purposes of assessing coverage. *See id.* § 1630.2(i)(1)(i). Arguably, prior to the enactment of the ADAAA, this level of restriction may have fallen somewhat outside the zone of disability. *Cf. Lowe's v. Angelo Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir. 1996) (holding that a reasonable jury could conclude that a 15-pound lifting restriction constitutes a disability under the ADA and reversing grant of summary judgment based on district court's contrary finding); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 21 (1st Cir. 2002) (lifting is a major life activity); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1100 (S.D. Ga. 1995) (material issue of fact existed precluding summary judgment as to whether plaintiff was substantially limited where plaintiff could not lift more than 10-15 pounds); *Martin v. Lockheed Martin Missiles & Space*, No. C96-4620 FMS, 1998 WL 303089, at *5-6 (N.D. Cal. Apr. 1, 1998) (same for 10-pound restriction).

But under the more liberalized view of the "disability" element post-ADAAA, Plaintiff's 15/35 pound lifting restriction is clearly sufficient. *See, e.g., Rico v. Xcel*

30

*Energy, Inc.*, 893 F. Supp. 2d 1165, 1170 (D. N.M. 2012) (An alleged restriction against climbing and lifting more than 60 pounds sufficient to demonstrate disability under the ADAAA); *Williams v. United Parcel Servs., Inc.*, No. 2:10–1546–RMG, 2012 WL 601867, at *3 (D.S.C. Feb. 23, 2012) (20-pound lifting restriction sufficient to survive summary judgment as to existence of a disability under the ADAAA); *Tate v. Sam's East, Inc.*, No. 3:11–CV–87, 2013 WL 1320634, at *3, *11 (E.D. Tenn. Mar. 29, 2013); *Lohf v. Great Plains Mfg., Inc.*, No. 10–1177–RDR, 2012 WL 2568170, at *5-*6 (D. Kan. July 2, 2012) (same, as to 25-30 pound restriction, along with restrictions on sitting and standing); *Farina v. Branford Bd. Of Educ.*, No. 3:09–CV–49 (JCH), 2010 WL 3829160, at *11 (D. Conn. Sept. 23, 2010) ("it is possible that even a relatively minor lifting restriction could qualify as a disability within the statute.").[9]

Defendant primarily cites *Rossbach v. City of Miami*, 371 F.3d 1354 (11th Cir. 2004), to support its argument that, while Plaintiff cannot perform all the duties of a police officer, she is not disabled. Def. Br. [42-1] at 30. The police officer plaintiffs

---

[9] Defendant confuses the issue by arguing that Plaintiff's inability to lift 200 pounds and therefore meet all of the written requirements of the Police Officer II position was not sufficiently restrictive as to be a true "disability" even under the ADAAA. Plaintiff's lifting restriction, however, was not to 200 pounds, but rather to 35 pounds (occasionally) and 15 pounds (frequently). Plaintiff's inability to lift up to 200 pounds is what allegedly disqualified her from being a police officer, as will be discussed further.

in *Rossbach* each had suffered on-the-job injuries that the Court found readily satisfied the ADA's first requirement that a plaintiff be impaired. *Rossbach*, 371 F.3d at 1357. Specifically, these impairments prevented the officers from being able to stand, sit, walk, or sleep for "extended periods of time." *Id.* at 1359. The Court turned to the ADA's second requirement and found that the plaintiffs were not substantially limited in these activities as many adults have similar limitations. *Id.* The Court then concluded that "someone who walks, sits, stands or sleeps moderately below average is not disabled under the Act." *Id.* (quotation omitted).

The *Rossbach* Court next addressed whether the plaintiffs were substantially limited in the major life activity of working, or whether the defendant had regarded them as such. *Id.* The Court assumed that the plaintiffs' impairments prevented them from working as combat-ready police officers, or alternately, that the defendant perceived them as being unable to do so, which led the Court to its final question: Is a "police officer" a "class of jobs" or "broad range of jobs" under the ADA? *Id.* at 1360. The Court ultimately concluded that "police officer" is not a broad enough classification to constitute a "class of jobs," and that the plaintiffs were accordingly not disabled per the ADA's provisions. *Id.*

Defendant's reliance upon *Rossbach* is misplaced for multiple reasons, most notably that this case predates the 2008 Amendments to the ADA, which expressly

state that lifting–Plaintiff's stated impairment–is a major life activity. Plaintiff has thus presented evidence that demonstrates that she is substantially limited in a major life activity, that is, at a minimum, lifting. Indeed, Plaintiff can only lift thirty pounds on an occasional basis and fifteen pounds on a frequent basis from the floor to a waist level height. White Dec., Exh. 8 at 4. Moreover, she can only lift up to fifteen pounds on an occasional basis to an overhead position. *Id.* This limitation alone is sufficient to survive summary judgment as to the existence of a disability.

### 2. *Qualified Individual*

A "qualified individual" is a disabled individual who, with or without reasonable accommodation, can perform the essential functions of the position in question during the relevant time period. *See Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287 n.17 (1987); *Lucas*, 257 F.3d at 1255; *Chanda*, 234 F.3d at 1221; *Holbrook*, 112 F.3d at 1526; *Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir. 1994). Thus, employees must be able to meet all of a job's requirements in spite of any disability in order to establish a valid ADA claim. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979).

The Eleventh Circuit follows a two-step approach to determining when a disabled person is otherwise qualified. *Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000). First, the court determines whether the person has the requisite

qualifications for the positions, such as sufficient experience and skills, education, and any appropriate licenses. *Id.* Second, the court assesses whether the person can perform the essential functions of the job in question, either with or without a reasonable accommodation. *Id.*; *see also Arline*, 480 U.S. at 287 n.17.

During the relevant time period, Plaintiff had the requisite qualifications, such as licensing, education, and experience, for the Police Officer II position as she held this position prior to sustaining her injuries. The Court next considers whether Plaintiff could perform the essential functions of the Police Officer II position. *See Reed*, 206 F.3d at 1062.

Essential functions are the fundamental job duties of the employment position and do not include marginal functions. *See* 29 C.F.R. § 1630.2(n); *see also Lucas*, 257 F.3d at 1258; *Frix*, 970 F. Supp. at 1034; *Sidaris v. Runyon*, 967 F. Supp. 1260, 1266 (M.D. Ala. 1997). Evidence of whether a particular function is essential includes: (1) the employer's judgment as to what functions of a job are essential; (2) written job descriptions; (3) the amount of time spent performing the particular function; and (4) the consequences of not requiring the job holder to perform the function. *See* 29 C.F.R. § 1630.2(n)(3); *see also Lucas*, 257 F.3d at 1258; *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *Frix*, 970 F. Supp. at 1034.

In determining what functions of a given job are deemed to be essential, "consideration shall be given to the employer's judgment . . . and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Holbrook*, 112 F.3d at 1526 (citation omitted); *see also Lucas*, 257 F.3d at 1258; *Earl*, 207 F.3d at 1365. The regulations also state three factors that make it more likely that a specific duty is an essential function of the job: (1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the person holding the position was hired for his or her ability to perform the particular function. *See Holbrook*, 112 F.3d at 1526 (citing 29 C.F.R. § 1630.2(n)(2)(i)-(iii)).

It is not enough for an employer to merely label a function essential; the employer must instead actually require employees in the position at issue to perform those functions that the employer claims are essential to the position. *See* 29 C.F.R. § 1630.2(n); *see also Sidaris*, 967 F. Supp. at 1266. Performing essential functions means that an employee is "able to perform those functions without risk of serious physical harm to oneself or others." *Sidaris*, 967 F. Supp. at 1266 (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1126 (11th Cir. 1993)).

If Plaintiff cannot perform the essential functions of her position without a reasonable accommodation, she must make a prima facie showing that a reasonable accommodation is possible, and that such an accommodation would enable her to perform those essential functions. *See Lucas*, 257 F.3d at 1255-56; *Jackson*, 22 F.3d at 281 (citations omitted).

If Plaintiff is able to meet this burden, Defendant must produce evidence of an affirmative defense that the accommodation requested is unreasonable or that it would cause an undue hardship on the employer. *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996). Plaintiff, however, retains the burden at all times of identifying a reasonable accommodation that is available and demonstrating that the accommodation would allow her to perform the essential functions of the job. *See Lucas*, 257 F.3d at 1255-56; *Holbrook*, 112 F.3d at 1527; *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996).

Determining what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation. *See Holbrook*, 112 F.3d at 1527. The regulations provide that an employer may restructure a job by reallocating or redistributing non-essential, marginal job functions, but is not required to reallocate essential functions. The essential functions are by definition those that the individual who

holds the job would have to perform, with or without accommodation, in order to be considered qualified for the position. *See* 29 C.F.R. 1630.2(n); *Holbrook*, 112 F.3d at 1527; *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (an employer is not required to reallocate job duties in order to change the essential functions of a job); *Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) (a reasonable accommodation does not require an employer to eliminate the essential functions of a position). Thus, if the employee is unable to perform the essential functions of the position with reasonable accommodations, the employer has no duty to eliminate the essential functions of the position or to hire someone else who can perform those functions for the employee.

Plaintiff does not argue that any reasonable accommodation exists that would allow her to lift 200 pounds, which is allegedly an essential function of a police officer position. Nevertheless, she argues that she is a "qualified individual" because she "was qualified to perform the essential function[s] of her restricted desk duty police officer positions[.]" Pl. Res. [46] at 14. Plaintiff thus argues that she would have been able to perform her duties as a desk officer. *Id.* at 15. Alternately, Plaintiff asserts that she would have taken a detective or investigative position, but she

acknowledges that Defendant had no such available positions. (Def. SOMF ¶ 35; Pl. Res. Def. SOMF ¶ 35).[10]

Defendant contends that permanent, light-duty positions are not available for police officers with restrictions. Def. Br. [42-1] at 26-27. Instead, other than the few officers on *temporary* restricted duty, the police officers on desk duty have the ability to perform all the duties of a police officer, including lifting. *Id.* Additionally, Defendant explains, and Plaintiff concedes, that it had no vacancies for detective or investigative positions. (Def. SOMF ¶ 35; Pl. Res. Def. SOMF ¶ 35).

Generally, it is unreasonable to require an employer to permanently excuse an employee from performing aspects of the job, redefining the job to exclude the functions he cannot perform, or reassigning those tasks to other employees. *See Lucas*, 257 F.3d at 1260 ("[E]mployers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists."); *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 819 (7th Cir. 2004)

---

[10] Plaintiff also appears to argue that she was capable of performing all physical aspects of the Police Officer II position as of November 1, 2012, after she received medical clearance for full duty. (*Id.*) Plaintiff's reliance on the November 1 medical clearance is inapt, however, because the undisputed record shows that her doctor clarified his report five days later to state that Plaintiff was released to full duty "at her current [light duty] position not that of a police officer." White Aff. ¶ 27. Thus, this clearance does not establish that Plaintiff could perform the full range of physical tasks associated with the Police II position.

(employer need not alter employee's job such that he would be performing functions he could do, omitting other essential functions."). More specifically, employers are not required to modify an employee's existing medium- or heavy-duty position into exclusively light-duty work because of a lifting restriction. *See, e.g., Richardson v. Friendly Ice Cream*, 594 F.3d 69, 80-81 (1st Cir. 2010) (employer need not excuse a restaurant manager from necessary lifting on the basis of a shoulder injury and lifting restrictions); *Burch v. City of Nacogdoches*, 174 F.3d 615, 620-21 (5th Cir. 1999). On the other hand, an employer may be required to excuse an employee's performance of marginal tasks not essential to the job function. *See Lucas*, 257 F.3d at 1260.

Here, the published qualifications of the Police Officer II position specifically state that the "tasks involve the intermittent performance of extremely physically demanding work . . . that may involve the lifting . . . of extremely heavy objects (200+ pounds), such as in the event of chasing and subduing a suspect resisting arrest." (Def. SOMF ¶ 16; Pl. Res. Def. SOMF ¶ 16). This Court must accord substantial weight to Defendant's job description. See 42 U.S .C. § 12111(8); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007). However, lifting does not become an essential function of the Police Officer II position merely because Defendant has listed this task in a job description. *See* 29 C.F.R. § 1630.2(n); *see also*

*Holly*, 492 F.3d at 1258 (explaining that employer's judgment regarding essential functions is not "conclusive" because if it were, an employer could circumvent the provisions of the ADA by merely including certain functions as essential in a job description–even though they are not–to avoid being "inconvenienced" by making a reasonable accommodation for an otherwise qualified individual with a disability, even when such an accommodation would not impose an undue hardship upon it) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Instead, the Court must weigh the Defendant's job description against all other relevant factors, including the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs, 29 C.F.R. § 1630.2(n)(3)(ii)-(vii), and considerations such as whether (i) the position exists to perform that function; (ii) a limited number of employees are available among whom that job function can be distributed; and (iii) the job function is "highly specialized" so that the incumbent is hired for their expertise or ability to perform that function. Id. § 1630.2(n)(2). *See* 29 C.F.R. § 1630.2(n); *see also Sidaris*, 967 F. Supp. at 1266.

The Court perceives issues of fact as to the "essential duties" of the Cobb County police officer position and, ultimately, whether Plaintiff was "qualified."

First, while it is undisputed that the Police Officer II job description includes the requirement of lifting 200 pounds, Plaintiff has offered specific evidence suggesting that Defendant does not actually implement this requirement. (Pl. Res. Def. SOMF ¶ 13). Notably, Plaintiff contends that Defendant does not test police officers to verify their ability to carry, push, or pull 200 pounds. (*Id.*). Additionally, Plaintiff argues that even the 200-pound specification is inaccurate as officers need only bench press half of their body weight during an annual physical training session. (Pl. SOMF ¶ 182).[11] That the Defendant does not appear to enforce or verify this supposed qualification could be seen by a jury as suggesting that the qualification is not truly essential.

Moreover, although Defendant claims it only has a single Police Officer II position–and that it is essential for every police officer holding this title to lift 200 pounds–a jury could find the truth to be a bit more murky. Specifically, a jury could find that Defendant has, *de facto*, created or at least acquiesced to the existence of

---

[11] It is unclear, and Defendant introduces no evidence to show, how Plaintiff's lifting restriction impacts her ability to bench press. Plaintiff's Functional Capacity Evaluation only includes a specific limitation of "waist level lifting tolerances" of up to 35 pounds. Defendant supplies no evidence to establish that this waist level lifting instruction applies equally to Plaintiff's ability to bench press, which reflects pushing (not lifting) from a prone position. In any event, the evidence includes no indication of how much pushing or lifting of any amount is actually required in the day-to-day work of a Cobb County police officer.

different classes of police officer positions with different demands. Specifically, Defendant acknowledges that "there are posts that are primarily administrative in nature," and that "some officers have been in their current desk assignments for a few years . . . ." [42-1] at 9. These are not just restrictive duty disability accommodations. Indeed, Defendant makes a point to show that officers such as Cox, Duteau, Ely and Fulenwider served in administrative desk positions–in many cases for lengthy periods–despite being capable of full duty. *See* [52] at n.3.[12] Defendant points out that these officers are theoretically subject to being reassigned–although it appears they generally have not been–and that there may be emergencies that require shifts of manpower.[13] That is why, according to Defendant, even desk officers must be able to engage in heavy lifting, notwithstanding that "years" may go by while all they do is paperwork. But the evidence shows that at least some semi-permanent officer positions exist that do not involve anything more than the theoretical need to lift.

---

[12] As an example, as of October 2015, Duteau had been on desk duty since May 2013, despite being capable of "hit[ting] the streets" and performing more physical duties if needed. (Pl. Res. Def. SOMF ¶ 18) (citing Cox Dep. [58] at 98-99).

[13] Plaintiff states that officers such as Fulenwider, Ely and others "were never put back in patrol to help the manpower needs of the Department." Pl. Decl. [46-1] ¶ 17. Plaintiff establishes no basis for her to be able to establish this sweeping statement from her own personal non-hearsay knowledge. But that Plaintiff while she was on desk duty did not observe any of these other desk officers being sent out on patrol or street assignments arguably has some probative value.

It certainly stands to reason that the job of a police officer can be highly physically demanding at times. And great deference is due to the business judgment of any emergency response department as to what qualifications are "essential," particularly with regard to infrequent but possible emergency situations it must always be prepared for. But notwithstanding Defendant's claim, a jury could find on this record that that there is (as a practical, *de facto*, matter) at least a few "desk officer" positions within the Cobb County Police Department, which are separate from active patrol or response positions. And Defendant does not supply enough evidence for the Court to find, as a matter of law, that it is truly essential for the few desk officers holding this position, such as Duteau and Fulenwider, to lift 200 pounds.

The Eleventh Circuit has noted that whether job functions are essential is "evaluated on a case-by-case basis by examining a number of factors," and has favorably cited authority stating that this issue is "'typically not suitable for resolution on a motion for summary judgment.'" *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200 (11th Cir. 2014) (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013); *see also Jernigan v. BellSouth Telecomm., LLC*, 17 F. Supp. 3d 1317, 1322-23 (N.D. Ga. 2014). Applying these standards to the equivocal evidence of whether Defendant actually enforces or implements a lifting requirement, and as to

whether Defendant has effectively created at least a few specific desk police officer positions, the Court cannot recommend summary judgment in Defendant's favor on this point. Therefore, a jury could find that Plaintiff was qualified for at least some police officer positions.[14]

The question then becomes whether Defendant could have reasonably accommodated Plaintiff's limitations by assigning her to one of the *de facto* desk positions that the jury could find existed and that Plaintiff was qualified for. Defendant's only argument in this vein is that "even 'reasonable accommodation' does not require an employer to bump another employee from a position to accommodate or promote a disabled employee." *See* Def. Br. [42-1] at n.2 (quoting *Lucas v. WW Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001)). This legal principle is

---

[14] Plaintiff later relinquished her P.O.S.T certification as part of a negotiated resolution of the criminal charges that were later investigated against her. Defendant argues that Plaintiff would not be qualified as a police officer after that point, because a P.O.S.T. certification is indisputably required for that position. This argument is inapt, however, at least with respect to Defendant's demand for summary judgment. Most basically, the alleged criminal conduct, investigation, and Plaintiff's relinquishment of her certification occurred several months after Plaintiff was denied the opportunity to remain employed as a police officer. Thus, these circumstances do not undermine her qualifications for the job at the time she was denied the requested accommodation. Perhaps these events may be deemed relevant at trial as relating to the scope of damages, but they do not entitle Defendant to judgment as a matter of law as to liability under the ADA.

true. It is also true that Defendant was not required to create a new, additional desk duty position simply to accommodate Plaintiff.

But Defendant cites no evidence as to how many desk assignments existed and were available during the relevant time period and who else was holding those position and in what circumstances. Indeed, the record suggests that at least one officer who Defendant alleges was fully able to perform all duties–Abner Duteau–began serving in a indefinite desk officer position at least as of May 2013 if not earlier. (*See* Cox Dep. [58] at 98-99). This timing falls generally within the time frame during which Plaintiff requested but was denied assignment to such a position and before Plaintiff relinquished her P.O.S.T. certification. Thus, the Court cannot conclude as a matter of law, at least not on this record, that allowing Plaintiff to serve in an administrative desk job in late 2012 or early 2013 would have "bumped" another employee.

Accordingly, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [42] be **DENIED** as to Count II of Plaintiff's Complaint.

D.    Title VII Claim

Plaintiff alleges that Defendant discriminated against her based on her gender, in violation of Title VII. Complaint [1] ¶¶ 53-58. Specifically, Plaintiff alleges that Defendant denied her sick leave, failed to provide her with a reasonable

accommodation by allowing her to remain in a light-duty police officer position, and refused to allow her to return to full duty as a police officer after she was cleared to full duty. *Id.* However, Plaintiff contends, Defendant provided leave and permanent, light-duty positions to similarly situated male officers, and also allowed them to return to full duty once they had their physician's permission. *Id.*

### 1. *Standard of Proof under Title VII*

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Additionally, statistical proof may also be used as circumstantial evidence to establish intent. *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 675 (10th ed. 2014); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.

Instead, evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley*, 907 F.2d at 1081-82. Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, such as by using the framework established in *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield*, 115 F.3d at 1561-62; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Combs*, 106 F.3d at 1527.

Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a prima facie case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions.

*Combs*, 106 F.3d at 1529. A prima facie case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U. S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a prima facie case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.* at 1184 (quoting *Aikens*, 460 U.S. at 713-14). The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

Nevertheless, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff also may defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quotation marks omitted).

### 2. *Plaintiff's Prima Facie Case*

Plaintiff does not contend that she has produced any direct evidence of discriminatory intent; thus her Title VII gender discrimination claim rests purely on circumstantial evidence and will be analyzed under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a prima facie case of unlawful discrimination under Title VII by showing that: (1) she is a member of a protected class;[15] (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question; and (4) her employer

---

[15] Although courts continue to include the requirement that a plaintiff establish as part of a prima facie case that he or she is a member of a "protected class," it is clear that individuals of either gender may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999). Thus, the key element of the prima facie case is establishing that persons outside of the plaintiff's protected classification (i.e., those of a different gender) were treated more favorably by the employer. *Id.*

treated similarly situated employees outside her protected classification (i.e., those of a different gender) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright*, 187 F.3d at 1290; *Holifield*, 115 F.3d at 1562. An adverse employment action is one that impacts the "terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (quotation omitted).

It is undisputed that Plaintiff is a member of a protected class as a female, and that she suffered adverse employment actions as she was not permitted to remain in a light-duty position and was not later reinstated to a full-duty police officer position.[16] However, as noted above, a factual dispute exists as to whether Plaintiff was qualified to be a full-duty police officer. Even assuming that Plaintiff was qualified, she nevertheless fails to show that Defendant treated similarly situated employees outside her protected classification (i.e., those of a different gender) more favorably than it treated her.

a. Comparator Evidence

Plaintiff argues that Defendant treated Michael Crider, Carl Ely, Abner Duteau, Jack Fulenwider, and other male employees more favorably. Pl. Res. [46] at 31-33;

---

[16] In her Response [46], Plaintiff focuses solely on these actions and does not mention Defendant's denial of her leave request as an adverse action.

(Pl. SOMF ¶ 219). Specifically, Plaintiff argues that Defendant permitted Mr. Crider, Mr. Ely, and Mr. Duteau to remain on light or restricted duty for extended periods of time. Pl. Res. [46] at 33. She contends that Mr. Fulenwider suffered a back injury and had been a police desk officer since 2003, and that Mr. Cox suffered an injury, but Defendant allowed him to return to full duty as an officer once his physician cleared him for this position. *Id.* at 32; (Pl. SOMF ¶ 219).

"When evaluating an allegation of disparate treatment," courts "require that a comparator be similarly-situated to the plaintiff in all relevant respects." *Stone & Webster Constr. v. U.S. Dept. of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (quotations and citation omitted). Indeed, the comparator employee "must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

"Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not 'similarly situated' for purposes of establishing a prima facie case." *Brown v. Jacobs Eng'g, Inc.*, 401 F. App'x 478, 480 (11th Cir. 2010). For example, in *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316-17 (11th Cir. 2003), the Eleventh Circuit affirmed a grant of summary judgment despite evidence that the African American plaintiff was disciplined more

harshly than a Caucasian co-worker who performed the same job, and who committed similar infractions. The court found that plaintiff failed to establish that the two employees were similarly situated in all relevant respects because, despite similarity in their misconduct, the comparator's overall record was better. *See id.*

As discussed in the statement of facts above, Plaintiff's assertions of fact significantly overstate what the admissible evidence she cites actually shows. As explained above, Plaintiff asserts far more facts about the medical conditions and work restrictions of other employees than what the evidence she points to permissibly supports. Much of Plaintiff's assertions are supported only by her own testimony, and Plaintiff fails to explain any foundation that would justify her ability to testify to what restrictions other employees were experiencing and when and what decisions Defendant's human resources staff made with regard to those employees.

At a minimum, however, it is undisputed that at least certain male officers (Ely, Duteau, and Fulenwider) were assigned to police officer desk positions for significant periods of time. At least one of these officers (Ely) was allowed to remain in this position under a medically imposed, light-duty restriction for at least a year. Plaintiff also points to Michael Crider, who despite suffering serious injuries that eventually were deemed to prevent his return to full-duty police work, was allowed to remain on restricted light duty by the county for 24 months, and was then offered civilian jobs.

Plaintiff argues that she was treated less favorably than these male officers, as she was not permitted to remain in a restricted, light-duty position as a police officer for more than approximately six months.

It is generally very hard, however, to compare medical accommodation decisions relating to different employees. Inherent differences exist in the nature and severity of injuries, the impacts those injuries may have on different people, the prognosis given to different employees, and any number of other highly individualized factors. An employer may logically choose to allow a still-recovering employee more time in a temporary accommodation than an employee who will never recover to full functionality. For Plaintiff to truly be similarly situated to Crider, Ely, and the others, therefore, there must be some basis to find their work restrictions and prognoses to be similar.

Plaintiff's showing of similarity is lacking in significant respects. Plaintiff does not show that Defendant allowed that male officer to remain indefinitely on light police officer duty after being informed that the officer will never recover to full duty. The record shows that certain officers (e.g., Duteau and Fulenwider) enjoyed long stints at desk jobs, but there is no indication that they were restricted from performing

all duties if necessary.[17] That differs significantly from Plaintiff's situation, as it is undisputed that she could not perform the full range of physical duties included in the Police Officer II job description. The record shows that other officers (e.g., Crider and Ely) may have enjoyed longer stints on restricted duty, but there is no indication that Defendant allowed them to continue after having been advised that their restrictions would be permanent. Again, that differs from the situation faced by Plaintiff, who claims that she should have been allowed to serve indefinitely as a police officer even after her own doctor opined that "it is medically unlikely that she would ever return to the normal job as a police officer."

If anything, the record shows a basic similarity between how Defendant treated Crider and Plaintiff. After it became evident that Crider was not recovering to full police officer capabilities, Defendant apparently discontinued his police officer restricted-duty assignment, and allowed him to transfer to lower-paying support jobs.

---

[17] Indeed, as noted above, the fact that fully able officers like Duteau or Fulenwider had positions that required no heavy lifting for several years, is evidence potentially supporting a finding that the 200-pound lifting requirement is not an "essential duty" to all police officer positions. This consideration shows something of a conflict between Plaintiff's ADA and Title VII claims. Under the ADA, Plaintiff is arguably "qualified" for an officer position, because a jury could find that semi-permanent desk positions are assigned to fully able officers, not just as temporary medical accommodations. But the fact that these other employees were fully able–and not subject to the physical restrictions that Plaintiff faced–presents a material distinction that impedes Plaintiff's reliance on these employees as comparators for purposes of her Title VII claim.

That, essentially, is also what happened to Plaintiff. Plaintiff complains that she was forced to make this change much earlier than Crider. But Plaintiff's doctor specifically said, only six months into her recovery, that "it is medically unlikely that she would ever return to the normal job as a police officer." There is no evidence of any similar prognosis at that juncture in Crider's case.[18]

As noted above, a jury could find for purposes of Plaintiff's ADA claim that heavy lifting was not an "essential" duty of a desk officer position. Thus, Defendant's refusal to retain Plaintiff in an available desk officer position on the basis of her lifting restriction could be seen as disability discrimination. But without evidence that a similarly impaired male officer was allowed the desk officer accommodation that Plaintiff demanded here, there is no basis to also find gender discrimination. Plaintiff simply does not show this necessary comparison. The Court therefore cannot find that Plaintiff's "comparator" evidence raises an inference of gender discrimination.

---

[18] Plaintiff at various times complains that Crider was given a second functional capacity evaluation but that Plaintiff was only given one. Again, however, the inherent differences between these two employees' medical circumstances makes it very difficult without substantially more evidence to show that the decision to give one employee and not another a second evaluation was based on gender. Indeed, Ms. White testified that the decision as to whether to approve multiple functional capacity evaluations relies on the judgment or recommendation of the treating physician, and that a secondary evaluation was not authorized for Plaintiff because it was not recommended by the treating physician. *See* White Dep. [59] at 188-89.

Plaintiff otherwise attempts to rely on a mosaic of other circumstantial evidence to show an inference of discriminatory intent. For example, Plaintiff cites an incident where she overheard one of her supervisors state that "women shouldn't be in policing," and another incident after she was demoted to a civilian position, in which she overheard one senior officer telling another that "only women should be in records." (Pl. Dep. [56] at 50, 167-68).

But Plaintiff does not show that these comments were made about her or her situation specifically, or were made by any supervisor who made a relevant decision in her case. The Eleventh Circuit has generally found that isolated remarks not related to the employment decision at issue–particularly when made by non-decision makers–are insufficient to create triable issues of fact. *See, e.g., Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (single remark by the company president that "Cubans are dumb" was insufficient to defeat summary judgment where the comment was unrelated to employment decision at issue and where the president was not the direct decisionmaker); *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (a remark, even by the decisionmaker, that another employee did not deserve her job because she was a woman was insufficient to defeat summary judgment). Plaintiff also perceived that the evening shift was "very much a boys club." (*See* Pl. Res. [46] at 34). But this perception is also too conclusory and

subjective to show that the employment decision at issue here–to decline to allow Plaintiff more than six months on restricted police officer duty–was based on her gender.

Thus, the Court concludes that Plaintiff has not shown sufficient evidence of discriminatory intent to sustain a prima facie case of discrimination.

### b.  Defendant's Legitimate, Nondiscriminatory Reasons

In any event, even had Plaintiff set forth a prima facie case of gender discrimination, Defendant has provided legitimate, nondiscriminatory reasons to rebut Plaintiff's prima facie case of gender discrimination. Specifically, Defendant argues that it did not reinstate Plaintiff as a police officer and instead offered her a civilian position because Dr. Weil did not clear her to return to full duty as a police officer. Def. Br. [42-1] at 28; (Def. SOMF ¶¶ 38-40). Indeed, Defendant only began looking for alternate, permanent, light-duty positions for Plaintiff after Dr. Weil opined that Plaintiff would be unable to return to work as a full-duty police officer. *Id.* Moreover, Defendant has presented evidence that, aside from police officers serving in *temporary*, restricted-duty positions, all other police officers–even those in administrative officer positions–have been released to full duty. Def. Br. [42-1] at 26.

Defendant explains that to the extent officers such as Ely were allowed to remain in light-duty police officer positions for longer than Plaintiff was, it was because their condition remained temporary and potentially subject to full recovery. When it becomes clear that an employee's full recovery is unlikely–such as with Crider and Plaintiff–Defendant shifts the employee to a non-police officer position. Defendant explains that this decision is not based on gender, and in fact, that Crider was treated similarly to Plaintiff based on his prognosis. The decision, rather, simply reflects the police department's stated policy that it has no permanent, light-duty police officer positions, and therefore, does not allow a police officer to stay on permanently if he or she is not expected to recover to full-duty status.

Plaintiff has provided no evidence revealing that Defendant's proffered reasons are actually a pretext for discrimination based on her gender. Plaintiff's primary argument is to insinuate that Dr. Weil was influenced, manipulated, or somehow directed by Defendant to falsely state that Plaintiff could not return to police officer work. Pl. Res. [46] at 21-22. However, such an assertion without supporting evidence is insufficient to create a genuine issue of material fact.

Plaintiff points out that Dr. Weil on June 21, 2015 issued a report indicating that a second surgery "may be necessary," and requesting a second MRI with contrast. (*See* Def. Resp. Pl. SOMF [53] ¶ 122). Then, shortly thereafter, Barbara

White at AmTrust talked to Dr. Weil, and apparently Dr. Weil reported to her that he would not in fact order anything else. *See* [59-2] at 9. It was a few days after this conversation that Dr. Weil made his notation that even with an additional surgery, "it is medically unlikely that [Plaintiff] would ever return to the normal job as a police officer." (*See* White Dep. [59], Exs. 36, 37). Then, five months later, in November, Dr. Weil issued a document stating that Plaintiff was released to full duty. (White Dep. [59], Exs. 45, 46). Ms. White called for clarification, given the earlier report opining that Plaintiff would never return to work as a police officer. *See* White Aff. ¶ 23. Ms. White explains that she only spoke with Dr. Weil's nurse, not the doctor himself. *Id.* ¶ 24. As Ms. White recounted in an email to Defendant's workers' compensation lawyer, "I talked with Dr. Weil's nurse, Paula, this morning. The full duty release is for the job [Plaintiff] is doing now, not police officer. They are going to send a note." (White Dep. [59], Exh. 51). Subsequently, Dr. Weil in fact issued a clarifying report stating that Plaintiff was released to full duty "at her current position not that of a police officer." White Aff. ¶ 27.

Plaintiff's inference from this series of events is that Ms. White at AmTrust (on Defendant's behalf) manipulated, pressured, or otherwise improperly influenced Dr. Weil to issue false statements as to Plaintiff's restrictions and chances of her recovery, and did all of this because of Plaintiff's gender. Neither side cites to

testimony from Dr. Weil. Defendant includes testimony from Ms. White specifically denying that neither she nor any other representative of Cobb County to her knowledge contacted Dr. Weil or his officer in an attempt to change any medical opinions. *See* White Aff. ¶¶ 50-51.

On this record, the speculation that Dr. Weil was somehow conspiring with AmTrust and/or Defendant is simply not enough to create a triable issue of fact as to pretext. The record includes detailed reports from Dr. Weil, apparently addressing a disagreement between him and Plaintiff as to what care she should receive. As Dr. Weil memorialized on July 17, 2012:

> The possibility of need for additional diagnostic studies has been discussed depending on the symptoms and course. There has been a very detail [sic] discussion on treatment plan. It was explained that even if the patient had more surgery it would be unlikely she would return to full police work. It was explained that the MRI is not recommended at this time. The patient notes that she wanted the MRI to see if there was a tear. It was discussed that surgery is not recommended at this time. The patient notes that she feels that she maybe able to do her normal work. There was a detail [sic] discussion to settle her case and try to return to full duty at her request or say [sic] with the current status . . . It was explained that again that it was she that by what she was telling us she could not returne [sic] at this time to full duty.

(White Dep. [59], Exh. 38 at 4-5). Plaintiff's apparent dissatisfaction with the care she received from Dr. Weil does not itself suggest that Dr. Weil was conspiring with Defendants.

That Defendant's third party workers' compensation administrator (AmTrust) was in communication with Dr. Weil about his evaluations–and requested clarification about obviously confusing statements–also does not suggest that Dr. Weil's statements did not reflect his legitimate medical opinion. It was within Ms. White's purview, for example, to ask for clarification when a doctor suggests somewhat equivocally that a second surgery "may be necessary." Or to also ask for clarification when a doctor states that a patient is cleared for full duty after having recently stated that the patient will likely never regain the ability to return to her normal job as a police officer. These facts do not themselves suggest undue influence, or that Ms. White was specifically targeting Plaintiff because of her gender (as opposed to simply following AmTrust's and Defendant's obvious financial motivation to avoid paying for more medical treatment).

Indeed, Ms. White's contemporaneous communications do not suggest any conspiracy. She simply reported, "I talked with Dr. Weil's nurse, Paula, this morning. The full-duty release is for the job she is doing now, not police officer. They are going to send a note." (White Dep. [59], Exh. 51). On its face, this simply describes clarifying information received from the doctor's assistant as to what the doctor meant, not some nefarious effort to strong arm a doctor into saying something

contrary to his medical opinion.[19] Plaintiff produces nothing in response other than her speculation that some workers' compensation fraud was afoot. This is insufficient to show significant evidence of pretext for gender discrimination.

Plaintiff's next argument for pretext is that Defendant's refusal to afford her six additional months of light duty violated Defendant's return-to-work policy, and an "an employer's deviation from its own standard procedures may serve as evidence of pretext." *See* Pl. Br. [46] at 44 (citing *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006)). The policy itself is not clear enough to draw this conclusion, however. It simply states that, after allowing an initial six-month, restricted-duty assignment:

> [T]he Cobb County Department of Public Safety will attempt where required or appropriate, to place such employees who remain not fit for duty after the expiration of six (6) months in a 'restricted duty' assignment for up to an additional six (6) months. The Public Safety Director will consider each extension request on a case by case basis.

---

[19] Plaintiff makes much of the lawyer's response to this email, which was simply, "Oh good. Thanks Barbara." (White Dep. [59], Exh. 51). This nicety does not expose some medical fraud somehow motivated by gender discrimination, either. It was obviously good for Defendant to obtain clarification, especially as by this point Plaintiff had already been released from the Police Officer II position. That the Defendant's lawyer used the expression "oh good," in response to learning news that was helpful in the resolution of the workers' compensation case, does not itself suggest foul play, and specifically is not probative of an intent to target Plaintiff because of her gender.

(Pl. SOMF ¶¶ 14-15). This document does not state that a second six-month, restricted-duty period is automatic or presumed. Rather, extensions must be on "request," are evaluated "on a case by case basis," are approved "where required or appropriate," and the document does not state what particular position an employee would be provided. Plaintiff cites to no information as to how this "case by case" evaluation is implemented, and what standards govern the determination of whether an extension is "required or appropriate." Thus, Defendant's decision not to extend Plaintiff's restricted police officer position for a second six-month period, after having been advised by Plaintiff's doctor that "it is medically unlikely that she would ever return to the normal job as a police officer," is not on its face inconsistent with the policy or evidence of how it is implemented.

Somewhat confusing things—but ultimately inapposite—is the deposition testimony of Cobb County Human Resources Director, Anthony Hagler. Mr. Hagler testified that he had no personal knowledge of, no role in implementing, and was not present to testify as a corporate witness as to the Department of Public Safety's workers' compensation policy that was in place in June 2012. (*See* Hagler Dep. [57] at 16-17, 53-55; Exh. 6 [57-1] at 32).[20] Nevertheless, Plaintiff's counsel in the

---

[20] Hagler explained that he only had personal knowledge of policies and procedures as of late 2012, when the county implemented a county-wide, return-to-work policy. *Id.* at 16-18. Before the county-wide policy (Hagler Dep. [57],

deposition showed Mr. Hagler that policy, and asked for his opinion as to whether "due to [Plaintiff's] request for the extension of duty, should she have been given more time in the restricted-duty capacity before being forced to take that demotion." (Hagler Dep. [57] at 158). Mr. Hagler responded, "[a]ccording to *their* policy [i.e., the policy of the police department that he had no prior knowledge of or involvement in before the deposition] it looks like it would have been." *Id.* (emphasis added). Mr. Hagler made clear that in answering questions about this police department policy, he was simply reading the document itself. *Id.* at 161 ("I was going by your exhibit."). Plaintiff then characterizes this testimony as an admission by the Defendant that it violated its own policies in denying Plaintiff more time on restricted duty.

Plaintiff significantly overstates the import of Mr. Hagler's testimony. Mr. Hagler specifically stated that he could not speak on Defendant's behalf about this police department policy, and that he had no knowledge of the document at all apparently before the deposition. In other words, counsel did little more than ask a random bystander what he personally thought of the meaning of a corporate document that he had no involvement in or knowledge of. Mr. Hagler's off-the-cuff response–"it looks like it would have been"–adds no probative value at all to the

---

Exh. 2), Hagler stated that the police department implemented its own policy without his involvement or supervision. *Id.*

meaning of the police department's policy and how it was implemented.[21] There remains no basis in the words of the policy itself or any evidence about its implementation to say that Defendant violated the policy in denying Plaintiff her extension request.

The rest of Plaintiff's arguments as to pretext are complaints about the substantive decisions that were made in the workers' compensation case. But this case is not generally a venue for re-litigating whether Plaintiff should have received more or different treatment or should have been offered different positions. The question is whether Plaintiff has evidence that these decisions were made on the basis of gender discrimination, such as by showing disparate treatment of similarly situated males. As explained at length above, Plaintiff simply does not show this. Therefore, Plaintiff fails to show significantly probative evidence of pretext and her gender discrimination claim should be dismissed.

E.   Plaintiff's Retaliation Claim

Plaintiff alleges that Defendant retaliated against her for filing an EEOC Charge by denying her a police officer position during the pendency of the

---

[21] Clearly, this was no corporate "admission." Mr. Hagler disclaimed being a 30(b)(6) representative on this issue. And because Mr. Hagler and his department had no involvement in this policy or its implementation, his testimony was not on a matter within the scope of his employment responsibilities pursuant to FED. R. EVID. 801(d)(2)(D).

investigation, and by initiating a criminal investigation against her, in violation of Title VII and the ADAAA. *Id.* ¶¶ 70-81. She further alleges that Defendant retaliated against her for filing the EEOC Charge by denying her a reasonable accommodation as a police officer, even after her physician cleared her for full duty, in violation of the ADAAA. *Id.* ¶¶ 70, 71, 73.

## 1. Exhaustion of Administrative Remedies

Before a plaintiff may pursue any claim of employment discrimination under Title VII or the ADA in federal court, she first must exhaust the administrative remedies required under the applicable statute by filing a charge of discrimination with the EEOC. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) ("Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies.") (citing *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999); 42 U.S.C. § 2000e-5(b)); *Zillyette v. Capital One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964.") (citing 42 U.S.C. § 12117(a)); see also 42 U.S.C. § 2000e-5(e) (Title VII requires that an employee file a charge of discrimination with the EEOC within 180 days "after the alleged unlawful employment practice occurred").

After filing the charge of discrimination with the EEOC, the aggrieved employee must receive a right-to-sue notice indicating that the EEOC has completed its investigation of that charge before the employee may pursue a civil action in federal court. *See* 42 U.S.C. § 2000e-5(f)(1) (a civil action may be brought against the respondent named in the charge within ninety days after the EEOC issues a right-to-sue notice). The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication. *See Wade v. Sec'y of Army*, 796 F.2d 1369, 1377 (11th Cir. 1986) ("The court must keep in mind that the purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer. Good faith effort by the employee to cooperate with the agency and EEOC and to provide all relevant, available information is all that exhaustion requires.") (citations omitted).

In determining the permissible scope of an employment discrimination complaint brought under Title VII or the ADA, the district court must first look to the EEOC charge and investigation. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983). A Title VII or ADA plaintiff is precluded from pursuing any claims in a federal court action that are not "like or related" to the claims asserted in the EEOC charge, or that could not reasonably be expected to arise during the course

of the EEOC investigation. *Coon v. Ga. Pac. Corp.*, 829 F.2d 1563, 1569 (11th Cir. 1987); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970); *see also Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985); *Evans*, 696 F.2d at 928. Therefore, additional charges in the civil complaint, which do not arise naturally and logically from the facts presented to the EEOC, are not related to the original charge, and cannot be pursued in a civil action under Title VII or the ADA.

Nevertheless, courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," and are not to be overly strict in interpreting compliance with the EEOC process. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (citation and quotations omitted). Thus, courts are not required to dismiss claims for retaliation even where the plaintiff failed to check the "retaliation" box on the EEOC form, so long as the alleged retaliation was sufficiently related to the same facts alleged in the EEOC complaint. *See id.* (affirming district court's refusal to dismiss retaliation claim, where plaintiff alleged that her termination was both the result of discrimination and retaliation, despite having only checked the box alleging discrimination during the EEOC proceeding).

Here, Plaintiff alleges that Defendant retaliated against her for filing an EEOC Charge. *See* Complaint ¶¶ 70-81. Defendant specifically notes, and Plaintiff concedes, that Plaintiff did not file a separate Charge regarding her retaliation claims,

nor did she seek to amend her original Charge. (Def. SOMF ¶ 72; Pl. Res. Def. SOMF ¶ 72). To the extent that Defendant attempts to argue that Plaintiff has failed to exhaust her administrative remedies, the Court finds that this is untrue. Plaintiff is not required to file a separate EEOC Charge regarding her retaliation claims that directly stem from her EEOC Charge. *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988) (holding that it is unnecessary for a Plaintiff who has already initiated an EEOC proceeding to exhaust administrative remedies prior to alleging retaliation growing out of that EEOC proceeding). Thus, Plaintiff's retaliation claims are properly exhausted.

### 2.  Failure to State a Claim

Title VII and the ADA prohibit an employer for retaliating against an employee who makes a charge, testifies, assists, or participates "in any manner in an investigation, proceeding, or hearing" regarding an unlawful employment practice. 42 U.S.C. § 2000e-3; 42 U.S.C. § 12203(a). To establish a prima facie case of illegal retaliation under Title VII or the ADA, a plaintiff must generally show that: (1) she engaged in a statutorily protected activity or expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016);

*Standard v. A.B.E.L. Servs.*, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998) (noting that the Court uses the same framework to assess retaliation claims under Title VII and the ADA). Moreover, a plaintiff must demonstrate that her protected activity is "a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. __, 133 S. Ct. 2517, 2534 (2013).[22]

As with a Title VII or ADA discrimination claim, a plaintiff may establish a claim of retaliation under these statutes by direct or circumstantial evidence. *Wilson*, 376 F.3d at 1086; *Holifield*, 115 F.3d at 1566. When a plaintiff only produces circumstantial evidence, a court may use the burden shifting, *McDonnell Douglas* framework. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). Thus, once a plaintiff establishes her prima facie case, the employer must provide "a legitimate, non-retaliatory reason for the adverse employment action." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). A "plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." *Id.*

At the outset, Plaintiff does not dispute that the County received an unsolicited complaint from a witness that Plaintiff was falsely representing herself as a police

---

[22]Prior to the Supreme Court's opinion in *Nassar*, this Circuit held that, to establish causation, a plaintiff only needed to show "that the protected activity and the adverse action are not completely unrelated." *Wideman*, 141 F.3d at 1454.

officer after she had been transferred out of that position. (*See* Pl. Res. Def. SOMF ¶ 58). Plaintiff cites nothing to suggest that the seemingly logical and responsible decision to investigate this unsolicited citizen complaint was for purposes of retaliation. Moreover, Plaintiff filed her EEOC Charge on November 9, 2012, and Defendant initiated the criminal investigation on August 5, 2013. (Def. SOMF ¶¶ 67, 70; Pl. Res. Def. SOMF ¶¶ 67, 70; Pl. SOMF ¶¶ 211, 328). As a result, the protected activity is too attenuated from the adverse employment action to satisfy the requisite causal link for a successful retaliation claim. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (explaining that, to establish a retaliation claim, "close temporal proximity" must exist between the protected activity and the adverse action, and that even a three-month time period between these two events is insufficient to establish a causal connection).

Plaintiff further argues that Defendant continued to deny her a police officer position after she filed an EEOC Charge, even though her physician cleared her to return to full duty. Complaint [1] ¶ 72. But the timing does not support this assertion either. As discussed above, Dr. Weil initially stated that Plaintiff could return to a full-duty officer position on November 1, 2012, but after Ms. White sought clarification from Dr. Weil's nurse, Dr. Weil clarified on November 6, 2012, that Plaintiff was not cleared for full police duty. As explained above, there is no evidence

that this was anything other than Dr. Weil's true medical judgment. In any event, all of this occurred days *before* Plaintiff filed her EEOC Charge. (Def. SOMF ¶¶ 48-49; Pl. Res. Def. SOMF ¶ 48-49; Pl. SOMF ¶¶ 184, 190). Defendant's actions could not be in retaliation for protected activity that had not yet happened. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (explaining that, to establish a causal link between the protected activity and the adverse action, "a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action"). Thus, Plaintiff's retaliation claims under both Title VII and the ADA fail, and the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [42] be **GRANTED** as to Counts III and IV of Plaintiff's Complaint [1].

## III.   CONCLUSION

For the above reasons, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [42] be **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **RECOMMENDS** that Plaintiff's ADA claim proceed to trial,

but that all other claims be dismissed. The Clerk is **DIRECTED** to withdraw the

reference to the undersigned.

      **IT IS SO RECOMMENDED** this 13th day of July, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE